# Diep Bui *vs.* Ha T. Ma.

No. 03-P-567.

Suffolk. March 5, 2004. - November 29, 2004.

Present: Laurence, Kantrowitz, & Cohen, JJ.

*Res Judicata. Judgment,* Preclusive effect. *Summary Process. Contract,* Lease of real estate, Ratification. *Landlord and Tenant,* Eviction.

In an appeal of a summary process action to determine the right to possession of commercial property, this court concluded that principles of claim preclusion barred the landlord from asserting two of the grounds she relied on for eviction (invalidation of the lease due to foreclosure and violation of the use restriction contained in the lease), where those grounds either were raised or could have been raised in an earlier summary process action between the tenant and the predecessor landlord, with whom the current landlord was in privity [561-563]; further, where the current landlord ratified the predecessor landlord's lease by purposefully seeking benefits under the lease, acting upon it, and affirmatively acknowledging it, she could not now argue that the lease had terminated upon her purchase of the property from the predecessor and was not binding on her [563-565]; judgment for possession in favor of the tenant was therefore warranted.

Summary process. Complaint filed in the Dorchester Division of the District Court Department on April 6, 1999.

On appeal to the Superior Court Department, the case was heard by *Diane M. Kottmyer,* J.

*Paul A. Palermino* for the defendant.

*James P. Long* for the plaintiff.

Cohen, J. At issue in this appeal is whether the plaintiff, Diep Bui, or the defendant, Ha T. Ma, has the right to possession of a 1,500 square foot commercial condominium unit (premises) located in a building on Dorchester Avenue in Boston. Both women, immigrants from Vietnam, wish to use the premises for a restaurant. Since March, 1994, Ma has occupied the premises as proprietor of the Hau Giang Restaurant, an establishment that serves Vietnamese food and sells sandwiches. Over the past

seven years, the validity of Ma's continued use and occupancy of the premises has been challenged both by the prior owner of the property, Atlantic Realty Trust (Atlantic), and by Bui, who purchased the premises and an adjacent commercial condominium unit from Atlantic in March, 1998, with the intention of operating her own Vietnamese restaurant in the combined commercial space.

The present case began when Bui initiated summary process proceedings in the District Court in April, 1999. Ma prevailed in the District Court, but after a jury-waived trial de novo, a judge of the Superior Court ordered judgment for possession in favor of Bui. Ma brings this appeal, contending that she is entitled to remain in the premises pursuant to the terms of a March, 1994, lease she entered with the then-owner of the building, Royce Realty Trust (Royce). We agree with Ma and reverse, concluding that principles of claim preclusion and ratification prevent Bui from contesting the lease.

*Background.* The background of this case is lengthy and involved. Our recitation is chronological, derived from the judge's findings, from uncontradicted evidence that is consistent with those findings, and from findings made by a different judge in an earlier summary process case litigated between Ma and Bui's predecessor, Atlantic. As we later explain, the findings in the Atlantic case are binding upon Bui.

The premises occupied by Ma is part of a larger commercial parcel at 1153-1611 Dorchester Avenue (property). On November 1, 1989, Royce purchased the property, simultaneously granting USTrust a mortgage to secure a loan for a portion of the purchase price. At that time, the trustee of Royce was Joseph J. Grassello, and the beneficiaries were his sister and brother-in-law, Maria and Richard Miara. On June 8, 1993, Maria Miara succeeded her brother as trustee and undertook to manage the property for Royce.

As things stood in 1993, three businesses coexisted on the property in adjacent storefronts: a grocery store known as the Far East Market, a Thai restaurant known as Mr. Le, and a shop operated by Ma's foster brother, Chuong Pham, who held a five-year lease with options to extend for two additional five-year periods. Chuong Pham's lease contained a use restriction

providing that "[t]he lessee shall use the leased premises only for the purpose of [a] coffee shop, bakery and deli . . . not to compete with Mr. Le Restaurant or Far East Market." Be that as it may, in addition to selling sandwiches, Chuong Pham operated a full-service restaurant with seating for forty-eight persons, serving Vietnamese and Chinese cuisine. Maria Miara, who patronized the restaurant, had actual knowledge of Chuong Pham's use and apparently did not object.

In 1994, Chuong Pham informed Maria Miara that Ma was taking over his business and that she would like her own lease. A lease was prepared that provided for a three and one-half year term, commencing April 1, 1994, with options for two five-year extensions. The lease also contained the identical use restriction that was present in Chuong Pham's lease, as well as a provision that "[a]fter the first year the rent will increase up to 3% per year."

The lease between Ma and Royce was executed by both parties,[1] but never recorded. Thereafter, Ma operated her business in the same way as Chuong Pham, selling sandwiches but also running a full service restaurant. Maria Miara continued to be personally aware of the operation of the restaurant and even patronized it.

On November 9, 1994, USTrust recorded a notice of foreclosure of the mortgage it held on the property. A foreclosure auction was attended by a number of bidders, including an attorney, Keith Kiper, who represented Athena and Italo Grassello, the parents of Maria Miara. Although another individual was the high bidder, shortly thereafter he assigned his rights under the bid to Kiper, as trustee of Atlantic. On April 10, 1996, USTrust gave a foreclosure deed to Kiper as Atlantic's trustee, who quickly was succeeded in that capacity by Athena Grassello. After the foreclosure sale, Athena Grassello notified the tenants, including Ma, about the change in ownership. She directed them to pay their rents to Atlantic and designated Maria

[1]As discussed below, some years later there was litigation between Royce's successor, Atlantic, and Ma in which Atlantic contended that after the lease was prepared and signed by Maria Miara, it was not executed and returned by Ma. In that litigation it was found that Ma did, in fact, sign the lease in March, 1994, and the issue is no longer open to question. The judge in the present case reiterated the earlier finding.

Miara and her husband, Richard, as agents for the management of the property.

On April 23, 1996, Atlantic converted the property into condominium units, recording a master deed for the Far East Condominium and designating the premises occupied by Ma as unit three. By letter dated May 1, 1996, Atlantic informed Ma of this development and told her to contact Maria Miara, "the real estate broker marketing the property," should she wish to buy the premises. Ma also was informed that Atlantic "is not beginning or continuing any lease that may or may not be in force. All tenants are a tenant at will and may continue until their unit is sold. You will be given a sixty day notice to vacate if that is the case."

Discussions ensued about Ma purchasing the premises, but no agreement was reached. All the while, Ma continued to occupy the premises and pay rent to Atlantic. On March 11, 1997, Ma sent Athena Grassello a letter notifying Atlantic that she was exercising the first of her two options to extend her lease for five years. The letter specifically referenced her lease, stating, "I hereby exercise the extension option under the lease dated March 28, 1994 for another five (5) years commencing on December 1, 1997 and expiring on November 30, 2002." Atlantic responded, stating that there was no lease in effect.

At this juncture, Bui entered the picture — having been told by her brother (who held an interest in the Far East Market) that the property was a very good location for Bui and her husband to operate a Vietnamese restaurant. The Buis decided to purchase and combine two condominium units for this purpose — unit two, which originally was occupied by the Thai restaurant, Mr. Le, but which had evolved into a Vietnamese restaurant, Pho Pascal; and unit three, the premises occupied by Ma's restaurant, Hau Giang. On April 29, 1997, Bui offered to purchase units two and three, subject to their being vacant at closing. Bui and her husband had seen the property several times before they made the offer, and they knew that Ma was operating a full service Vietnamese restaurant in unit three.

Athena Grassello, on behalf of Atlantic, accepted Bui's offer on May 1, 1997. Bui and Atlantic then entered into a purchase and sale agreement, dated July 21, 1997, which again provided

that Bui's purchase of condominium units two and three was contingent upon the units being vacant at the time of the closing, which was scheduled for later that summer. The purchase and sale agreement stated that if the units were not vacant, the buyers would extend the closing date for a period not to exceed six months. If, at the end of that period, the premises still were not vacant, Atlantic would be obliged to refund Bui's deposit and pay a penalty of $10,000.

In furtherance of its obligation to deliver the premises tenant-free, Atlantic, by its attorney, John Collier, sent Ma a sixty-day notice to quit on August 1, 1997, explaining that the premises were "under agreement for sale and the owners are required to deliver the condominium vacant at the time of the closing." On October 27, 1997, Collier filed a summary process action in the District Court in which Atlantic contended that Ma was a tenant at will who had been given proper notice of termination. During the trial of that action, the lease between Ma and Royce was not brought to the judge's attention. Judgment for possession entered for Atlantic, and Ma appealed to the Superior Court.

In March, 1998, that case was retried to a judge of the Superior Court, sitting without a jury. During this trial, Ma, who was represented by new counsel, produced the 1994 lease bearing her signature and that of Maria Miara, as trustee of Royce, and the focus of the case became the validity of the lease and whether Atlantic was bound by it.

Up to this point, the closing on Bui's purchase of condominium units two and three had been postponed from its originally scheduled date of August 28, 1997. Then, after the Superior Court trial was completed, but before the judge issued a decision, Bui, fearing that she would lose her financing, decided to go ahead with the purchase even though the issue of Ma's occupancy remained unresolved.

The closing took place on March 31, 1998, with all parties to the sale represented by counsel. Collier, who had been appearing for Atlantic in the eviction proceedings, represented Atlantic, attorney Joel Fishman represented Bui, and attorney Peter Harrington represented Bui's mortgage lender, Equity One, Inc. Because Ma's continued occupancy of unit three remained a cause for concern, at or immediately before the closing the par-

ties and Collier, as escrow agent, entered into an escrow agreement providing that $30,000 from the sale proceeds would be placed in escrow "to guarantee the legal eviction by court order of tenant, Hau Giang Restaurant," and further providing that Atlantic would indemnify Bui for any additional costs incurred in connection with the eviction. The escrow agreement also contained Collier's representations that he had obtained a judgment of eviction in the District Court, that the tenant had appealed, and that the Superior Court had the case under advisement — but it did not refer to the lease that had become the central issue in the Superior Court case.

In their later trial testimony, Bui, her husband, and attorneys Collier, Fishman, and Harrington all denied that there was any discussion at or before the closing about the signed lease produced by Ma in the pending Superior Court proceedings. Fishman, who drafted the escrow agreement, testified that he had been informed by Collier sometime before the closing that Ma had been given a lease but that she had never signed or returned it and that Atlantic considered Ma to be a tenant at will. According to Fishman, Collier did not share with him the details of the Superior Court trial. Likewise, Collier testified that he did not discuss developments in the court case. His explanation for not doing so was that even though the lease had surfaced, he remained confident that Atlantic would prevail.

On April 15, 1998, approximately two weeks after the closing, the Superior Court judge decided the case between Atlantic and Ma, rejecting Atlantic's position that Ma had never signed and returned the lease that Royce had provided her. The judge found that the lease between Ma and Royce had been signed by both parties in March, 1994; that it was valid between them; that the subsequent acquisition of the property by Atlantic was not at arm's length, given Maria Miara's involvement as the agent for her parents and Atlantic with respect to both the purchase and management of the property; and that Maria Miara's knowledge concerning Ma's lease and its terms was imputed to Atlantic. Accordingly, the judge ruled that Atlantic, as a purchaser who acquired title to real estate with actual notice of an outstanding lease, took title subject to that lease, and that its notice to quit did not terminate Ma's tenancy. The

judge's decision did not discuss the effect, if any, of the intervening foreclosure by USTrust, nor did the judge determine whether Ma's tenancy was affected by the use restriction in the lease except to note that there was a dispute as to whether Ma was authorized to operate a restaurant on the premises, that the issue was not pursued prior to the foreclosure sale, and that there was no evidence that after Atlantic's acquisition of the property "the use of the premises as a restaurant was a problem or . . . one of the grounds for the notice to quit."[2]

Whatever Bui's prior state of knowledge about the lease, she came to know of its existence when the Atlantic case was decided. After discussions between Collier and Fishman, the decision in that case was not appealed.

Bui took possession of unit two, where she established Sunrise Restaurant, her own Vietnamese restaurant. As to the premises, Bui assumed the role of landlord and thereafter began to rely upon the existence and terms of the lease in her dealings with Ma. On June 9, 1998, Fishman, on Bui's behalf, wrote a letter to Ma's attorney stating that the decision in the Atlantic case left open the question of the use restriction and giving formal notice that Ma was in violation of the lease in that and other respects. Fishman's letter gave Ma thirty days, in accordance with paragraph 19(b) of the lease, to correct the defaults. The letter also demanded increased rent under the escalation clause, stating, "[T]he lease provides that the rent will increase up to 3% per year. My clients have received rent checks in the amount of $1,545. I hereby notify you that the rent as of April 1, 1997 should have been $1,639.09. It is not clear to me that the three percent annual cap is applicable to the option period and I request that you contact me so that we may discuss an appropriate rent for the option period commencing December 1, 1997, assuming that the defaults are corrected."

On November 12, 1998, after Ma was late with her rent, Bui personally sent Ma a letter purporting to "amend" the "leased contract" to include a late penalty charge of ten percent and to provide that Ma could be evicted and incur liability for Bui's legal fees if Ma's rental payments were late more than three

---

[2]We refer hereafter to the summary process action brought by Atlantic against Ma as "the Atlantic case."

times. Bui again wrote to Ma on December 29, 1998, this time demanding a late fee because Ma had sent the rent to the wrong address. Bui also stated that Ma was in violation of the use restriction because "only a deli is permitted," and demanded that Ma cease running her restaurant within one month's time.

On February 24, 1999, Bui, who was represented by a new attorney, brought an action in Superior Court seeking to enjoin Ma from operating a full-service Vietnamese restaurant "in violation of her commercial lease agreement." The case came before the same judge who heard the Atlantic case. The judge denied Bui's request for a preliminary injunction on the ground that Bui had an adequate remedy at law. Thereupon Bui voluntarily dismissed the Superior Court action, and commenced this summary process case. Bui's notice to quit and summary process complaint identified the grounds for eviction as Ma's violation of the use restriction and her failure to have paid automatically the three percent rent increase each year since the inception of the lease pursuant to the escalation clause as Bui construed it. After trial in the District Court, Ma prevailed.

At the end of October, 2001, the case was tried de novo in the Superior Court before a different Superior Court judge than the one who heard the Atlantic case. There the case took a different turn. Bui contended for the first time that she was entitled to possession because the lease was not binding upon her, relying upon two alternative rationales: first, that she had no actual knowledge of the lease prior to purchase and, therefore, the unrecorded lease for a term of more than seven years was invalid as to her, pursuant to G. L. c. 183, § 4; and second, that as matter of law, Ma's leasehold was terminated when USTrust foreclosed its mortgage before conveying the property to Atlantic.

Evidently crediting the testimony that the subject of the lease did not come up while the Atlantic case was being litigated or at the closing, the judge found that Bui did not have knowledge of the lease until after she purchased the premises. The judge also ruled that the foreclosure terminated the lease. She rejected Ma's position that Bui was bound by the prior decision affirming the lease as between Ma and Atlantic, because, in the judge's view, Bui did not yet own the premises, was not a party to that

action, and was not in privity with Atlantic, and because the earlier case had not explicitly considered the effect of the foreclosure. The judge also rejected the argument that Bui had ratified the lease by relying upon its terms, because even though Bui engaged in conduct that could constitute ratification, Bui's efforts, according to the judge, were consistently directed at removing Ma from the premises and could not reasonably be understood as an election to be bound by the lease.

*Discussion.*[3] Although this case well illustrates a variety of pitfalls that may arise in the context of commercial tenancies, the primary issue we consider is a procedural one — the effect of the litigation between Atlantic and Ma upon Bui's claims. We conclude that, under principles of claim preclusion, Bui was barred from asserting two of the grounds she relied upon for eviction: that the lease was invalidated by the foreclosure and that Ma's operation was prohibited by the use restriction.[4]

There are three essential elements to the doctrine of claim preclusion: "(1) the identity or privity of the parties to the present and prior actions; (2) identity of the cause of action; and (3) prior final judgment on the merits." *TLT Constr. Corp.* v. *A. Anthony Tappe & Assocs.*, 48 Mass. App. Ct. 1, 4 (1999), quoting from *Gloucester Marine Rys. Corp.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. 386, 390 (1994). Because the Atlantic case unquestionably resulted in a final judgment, we are concerned only with the first two elements.

Here, the requirement of privity was met if only because Bui succeeded to Atlantic's interest in the premises at a time when Bui knew of Atlantic's pending litigation with Ma. As articulated in Restatement (Second) of Judgments § 44 (1982), "[a] successor in interest of property that is the subject of a pending action to which his transferor is a party is bound by

---

[3]We note at the outset that the case has not become moot by expiration of the term of the contested lease. At oral argument, we were informed that Ma purported to exercise her second option to extend the lease for an additional five-year period to November 30, 2007.

[4]Although Ma incorrectly employs the term "collateral estoppel" in her brief, it is evident from her argument that the doctrine upon which she relies is claim preclusion, and we consider the issue in that light.

and entitled to the benefits of the rules of res judicata[5] to the same extent as his transferor, unless: (1) [a] procedure exists for notifying potential successors in interest of pending actions concerning property, the procedure was not followed, and the successor did not otherwise have knowledge of the action[6]; or (2) [t]he opposing party in the action knew of the transfer to the successor and knew also that the successor was unaware of the pending action." In this case, neither of the two exceptions to the general rule is applicable, since Bui had actual knowledge of Atlantic's pending suit before the closing. Accordingly, Bui stood in privity with Atlantic and was bound by the Atlantic case.

As for the remaining element — the identity of the claims asserted by Atlantic and Bui — the guiding principle is that Bui is precluded from litigating not only those claims that were actually decided in the Atlantic case but also those that could have been brought in that action. See *Charlette* v. *Charlette Bros. Foundry, Inc.*, 59 Mass. App. Ct. 34, 44 (2003) ("claim preclusion will apply even though a party is prepared in a second action to present different evidence or legal theories to support his claim or seeks different remedies"). In the Atlantic case, it was determined that Atlantic acquired the property subject to the terms of Ma's lease and that Atlantic's notice to quit did not terminate Ma's tenancy under the lease. Because the Atlantic case concerned the validity of the lease as between Ma and Atlantic, all claims regarding that issue, including the effect of the foreclosure, were precluded by that litigation. See *Ratner* v. *Rockwood Sprinkler Co.*, 340 Mass. 773, 775 (1960); *Glouces-*

---

[5]"The term 'res judicata' includes both claim preclusion, also known as true res judicata, and issue preclusion, traditionally known as collateral estoppel." *Mancuso* v. *Kinchla*, 60 Mass. App. Ct. 558, 564 (2004).

[6]The Massachusetts lis pendens statute, G. L. c. 184, § 15, is such a procedure, but it too explicitly does not protect those with actual notice of pending litigation. In 1996, at the time of the transfer from Atlantic to Bui, the lis pendens statute read, in relevant part: "A writ of entry or other proceeding, either at law or in equity, which affects the title to real property or the use and occupation thereof or the buildings thereon, shall not have any effect except against the parties thereto, their heirs and devisees *and persons having actual notice thereof*, until [a memorandum of lis pendens] is recorded . . ." (emphasis added). This language was retained when the statute was amended by St. 2002, c. 496.

*ter Marine Rys. Corp.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. at 391.

Similarly, Bui's claim that Ma's use of the premises violated the use restriction in the lease was also barred, because it is a ground for eviction that could have been raised by Atlantic. The facts supporting such a claim existed at the time of the Atlantic case. Indeed, the judge in the Atlantic case touched upon the subject, observing that there was a dispute whether Ma was authorized to operate a restaurant on the premises, that the issue was not pursued prior to the foreclosure sale, and that there was no evidence that after Atlantic's acquisition of the property "the use of the premises as a restaurant was a problem or . . . one of the grounds for the notice to quit." Later, the judge in the present case found that "[a]t all times, since [Ma] has been occupying the premises, she has operated a Vietnamese restaurant. At no time . . . has the menu or manner of service changed." In other words, Ma's use of the premises was no different after Bui's purchase than it was when Atlantic owned the property.

It does not matter that Bui's claim differed from those claims asserted by Atlantic in that it challenged Ma's compliance with the lease rather than its validity. That is because Bui's claim arose from the same lease agreement and, if successful, would have resulted in the same outcome sought by Atlantic — the termination of Ma's tenancy. See *TLT Constr. Corp.* v. *A. Anthony Tappe & Assocs.*, 48 Mass. App. Ct. at 8, quoting from *Mackintosh* v. *Chambers*, 285 Mass. 594, 596 (1934) ("a different form of liability is not a different cause of action, provided it grows out of the same transaction, act, agreement, and seeks redress for the same wrong"). See also *Saint Louis* v. *Baystate Med. Center, Inc.*, 30 Mass. App. Ct. 393, 399 (1991) (in determining the scope of claim preclusion we consider "[w]hether the facts are related in origin or motivation and whether they form a convenient trial unit"). Bui is precluded from asserting the use restriction claim because it was one that Atlantic had the opportunity, ability, and incentive to raise.[7]

We turn now to the remaining ground for eviction raised by

[7]Bui's use restriction claim is of questionable merit, in any event, since the meaning of the restriction (limiting operation to a coffee shop, bakery, and

Bui, one that is personal to Bui and therefore not barred by the Atlantic case. Ma's lease was for a three and one-half year initial term, with options to extend for two additional five-year terms. Thus, Bui argues, even if the lease was valid as to Atlantic, it terminated upon Bui's purchase of the premises because the lease was unrecorded, the lease was for a term greater than seven years, and, as the trial judge found,[8] Bui had no actual knowledge of its existence and term prior to the closing. See G. L. c. 183, § 4, as amended through St. 1986, c. 557, § 163 ("[a] conveyance of . . . a lease for more than seven years . . . shall not be valid as against any person, except the grantor or lessor, his heirs and devisees and persons having actual notice of it, unless it . . . is recorded in the registry of deeds"); *Leominster Gaslight Co.* v. *Hillery*, 197 Mass. 267, 268-269 (1908) (extension period is included in computing whether a lease exceeds seven years); *South St. Inn, Inc.* v. *Muehsam*, 323 Mass. 310, 312 (1948) (exception requires actual notice that a lease exists and that it is for more than seven years).

We agree with Bui that the lease was not binding upon her when she purchased the premises; however, we conclude that she subsequently ratified the lease by purposefully seeking benefits under the lease, acting upon it, and affirmatively acknowledging it. The lease was voidable, not void, and Bui could ratify it by her conduct. See *Rosenbloom* v. *Kaplan*, 273 Mass. 411, 416-417 (1930); *Carey's, Inc.* v. *Carey*, 25 Mass. App. Ct. 290, 300 n.7 (1988).

In this respect we reach a different conclusion from that of

---

deli) is informed by the fact that Ma's predecessor, Chuong Pham, occupied the premises under a lease containing the identical language, yet operated a sandwich shop and a Vietnamese restaurant with the full knowledge of Maria Miara. Given that Ma obtained her lease from Maria Miara on the understanding that Ma was taking over Chuong Pham's business, the restriction cannot reasonably be said to prohibit that use. See *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 496-497 (1997) (interpreting undefined use restriction with reference to extrinsic evidence).

[8]We do not accept Ma's argument that the judge's finding that Bui lacked knowledge of the lease before the closing was clearly erroneous. Although the judge could have inferred otherwise, the judge's finding is supported by a reasonable view of the evidence, and we therefore defer to it. See *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 642 (2003).

the trial judge, who reasoned that although Bui engaged in conduct that, in other circumstances, could constitute ratification of the lease, there was no ratification here. Although ratification is essentially a question of fact that will be reversed only if clearly erroneous, we scrutinize without deference the legal standard that the judge applied to the facts to ensure that her ultimate findings and conclusions are consistent with the law. See generally *Williams* v. *Resolution GGF Oy*, 417 Mass. 377, 382 (1994). In addition, if the judge's ultimate finding is inconsistent with her subsidiary findings, we will set aside the ultimate finding. See *Simon* v. *Weymouth Agric. & Industrial Soc.*, 389 Mass. 146, 148-149, 151-152 (1983).

Here, the judge gave two reasons for rejecting ratification, both of which are flawed: first, that the lease had terminated by operation of law — that is, the foreclosure; and second, that Bui's attempts to enforce the lease could not, in context, reasonably be viewed as an election to enter into a contract with Ma on the terms and conditions set forth in the lease because, "[a]t all times after [Bui] purchased Unit 3, [Bui's] efforts were unambiguously directed to evicting [Ma] from the premises." The first rationale is inapposite because, as previously discussed, it was not open to Bui to assert that the lease was terminated by the foreclosure. The second rationale is erroneous because it is inconsistent with the judge's subsidiary findings (based upon uncontroverted evidence) as to the actions taken by Bui and her attorneys to enforce the lease after Bui purchased the property.

Bui did not rely upon the lease solely as grounds for eviction; she also sought to capitalize upon its terms, demanding that, pursuant to the escalation clause (as Bui interpreted it), Ma was required to pay increased rent. While one might speculate that Bui's hidden motive was to place financial pressure upon Ma to leave the premises, the fact remains that when Bui learned about the existence of the lease after the Atlantic case was decided, she promptly elected to seek financial advantages under its provisions. Having done so, she adopted the lease as her own.

*Conclusion.* The judgment for possession in favor of Bui is

reversed, and a new judgment for possession shall enter in favor of Ma.

*So ordered.*